811 P.2d 370

**CIGNA HEALTH PLAN,**
Petitioner Employer,

**Pacific Employers Ins. Co.,**
Petitioner Carrier,

v.

**The INDUSTRIAL COMMISSION OF ARIZONA,** Respondent,

**Marsha Pride, Respondent Employee.**

No. 1 CA–IC 90–056.

Court of Appeals of Arizona,
Division 1, Department B.

April 2, 1991.

As Corrected May 13, 1991.

Reconsideration Denied May 21, 1991.

Long, Lester & Lundmark, P.A. by R. Todd Lundmark and Melinda K. Poppe, Phoenix, for petitioners employer and carrier.

Anita R. Valainis, Chief Counsel, Indus. Com'n of Arizona, Phoenix, for respondent.

Chris T. Johnson, Phoenix, for respondent employee.

## OPINION

JACOBSON, Presiding Judge.

This is a special action review of an Arizona Industrial Commission award reopening a December 1986 back injury claim based upon the treating physician's testimony that after the claim was closed in May 1988, symptoms related to the industrial injury had worsened and active care was again required. The sole issue on review is whether reopening was precluded. We conclude that preclusion does not apply and accordingly affirm the award.

Respondent employee (claimant), because of a traumatic amputation of her left leg in a 1962 auto accident, ambulated with a prosthesis. In December 1986, while working as a nurse for petitioner employer, she fell and toppled onto her buttocks and back. She filed a workers' compensation claim, which petitioner carrier (Pacific) accepted.

In April 1988, a group of physicians, which included orthopedic surgeon Vincent P. Russo, M.D., independently examined claimant. The consultants reviewed x-rays, which showed diffuse osteoporosis and chronic facet joint changes but no evidence of a right sided disc herniation. They reported that the industrial injury was stationary without "objective evidence of permanent impairment" related to the industrial injury.

Relying on this report, Pacific issued a notice of claim status closing the claim without permanent impairment. Claimant requested a hearing, asserting that the industrial injury was not yet stationary or that it had caused a permanent impairment.

Pending the hearing, claimant filed a February 1988 report by an Indiana orthopedic surgeon:

This patient was seen in the office on 2/8/88. This is a real interesting problem because this girl does not want any treatment and all she wants is to be disabled.

On the C.A.T. scan there is no evidence of a herniated disc. She does have some degenerative changes in her back and I am certain that she has some pain there. If the pain is severe enough, I think that treatment should be carried out.... I think that an epidural block would be fine or the pain center would be even a better way to go.

This girl does not want anything done, all she wants is a settlement and I do not know how to settle her. I suppose that if she wants to settle this and that is all there is to it, then you could probably attribute 5% of the patient's whole impairment relative to this injury. That would be the maximum because there is really no evidence of any objective evidence of impairment more than that at this time.

In June 1988 claimant returned to work as a nurse. On July 23, 1988, she again fell at work and fractured her left hip. In the initial history after the fracture, she reported having felt fine until the new injury.

On November 9, 1988, the parties notified the administrative law judge that they had reached a settlement and submitted an agreement for approval. The parties stipulated, in relevant part, that a hearing would produce conflicting medical evidence regarding permanent impairment:

Dr. Vincent P. Russo ... would testify that the Applicant is stationary with no permanent impairment, while Dr. Thomas Bodnar would testify that the Applicant has a 5% permanent impairment of the whole person causally related to the December 30, 1986 industrial injury.

To resolve this dispute, claimant agreed to withdraw her request for hearing and "expressly acknowledge[d] that the May 10, 1988 Notice of Claim Status will become final and *res judicata* as to those issues that could have been litigated at this time." In return, Pacific agreed to pay claimant $7,000. It also reserved a $7,000 credit against any future temporary or permanent disability benefits that claimant might be awarded as a result of the December 1986 injury. This credit, however, did not apply to future medical benefits. The agreement concluded by affirming that the parties

> believe a genuine dispute exists as to the existence of permanent impairment and, *thereafter, as to the amount of* permanent disability benefits that would be payable, if any. The parties further represent that reasonable minds may differ as to the weight and interpretation of the evidence that would be presented, so that the Applicant's right of recovery is uncertain. Further, each party wishes to avoid the possibility that it may lose, as well as to avoid the expense of litigation at further hearings before the Industrial Commission, and potentially an appeal thereafter. Each party believes that it is in their [sic] best interest to settle this matter under the terms of the proposed settlement.

The administrative law judge approved the settlement. Claimant waived her right of review and the May 10, 1988, notice closing the claim without permanent impairment became final.

On February 2, 1989, claimant saw Thomas Bodnar, M.D., an orthopedic surgeon who had been her treating physician in July 1987. Dr. Bodnar reported that she was "still having significant difficulty with degenerative disc disease in her lower back." He recommended trigger point injections, which previously had relieved the symptomatology. On February 27, 1989, claimant returned to Dr. Bodnar with complaints of severe lower back pain and of pain radiating into both legs. Dr. Bodnar reported that "we feel she may have had propigation [sic] of this disc degeneration." He recommended hospitalization for conservative treatment or, if necessary, surgery.

Relying on Dr. Bodnar's most recent report, claimant petitioned to reopen for "immediate hospitalization and possible surgery relating to her industrial injury." Pacific denied reopening, and claimant requested a hearing. Pending the hearing, the parties submitted several medical reports, including Dr. Bodnar's July 1987, June 1988, and February 1989 reports and Dr. Russo's October 1988 report. These submissions did not include a September 1988 report by Dr. Bodnar concerning permanent impairment.

In July 1989, Dr. Russo reevaluated claimant and reported that he could find no new or undiscovered condition.

At the hearings, claimant and Drs. Bodnar and Russo appeared. Claimant testified that her symptoms significantly worsened in February 1989. She had been able to work despite her symptoms before, but she was essentially bedridden now. In addition, injections had relieved her symptoms before, but they did not help now.

Dr. Bodnar confirmed that claimant had reported significantly worsened symptoms in February 1989 compared to the symptoms she had reported in June 1988, when he last examined her. In March 1988, he felt that the increased symptoms were consistent with a herniated disc. He acknowledged, however, he had found no objective change and had recommended but not yet performed a MRI to discover if the disc degeneration had propagated. Dr. Bodnar testified that he recommended reopening to provide active care for the worsened symptoms. In his opinion, the December 1986 industrial injury contributed to these symptoms and the need for additional care.

On cross-examination, Dr. Bodnar was questioned about the basis for his opinion that claimant had a 5% permanent impairment when the claim was closed in 1988:

Q. Was that five percent—what was that five percent permanent impairment based upon?

A. Based upon the exacerbation of her degenerative disc disease.

Q. So, you felt, then, in 1988 that the aggravation of the degenerative disc disease was permanent in nature?

A. Yes.

. . . .

Q. Okay. Your five percent figure then involved what you felt was a permanent aggravation of the degenerative disc disease and encompassed within the term degenerative disc disease is what you thought might be a herniated disc at the L5–S1 level?

A. Yes. There was some suggestion of greater bulging to the left side, yes.

Dr. Bodnar also agreed that claimant's current symptoms resulted from the progression of this aggravated degenerative disc disease, not from some new condition. Finally, Dr. Bodnar conceded that his opinion linking the current symptoms to the industrial injury presupposed that the industrial injury had permanently aggravated the underlying condition.

Dr. Russo not only disagreed with Dr. Bodnar's opinion that the industrial injury had permanently aggravated the underlying condition, he denied that the underlying condition contributed to claimant's symptoms. Rather, he considered the symptoms wholly subjective.

The administrative law judge then issued the award. He accepted Dr. Bodnar's testimony as more probably correct and well founded, and rejected the applicability of preclusion:

> Secondly, defendants raise the defense of *res judicata*. In effect, defendants argue that Dr. Bodnar's opinion regarding a causal relationship of applicant's present condition and her condition upon closure of her claim is based, at least in part, on Dr. Bodnar's opinion that applicant had a permanent impairment when her claim was closed. Defendants further argue that applicant entered into a compromise and settlement agreement in which it was agreed that applicant did not have a permanent impairment. This defense is rejected. Reopening is designed to mitigate the harsh consequences of general *res judicata* principles, which would normally preclude any

> re-examination of a claim once it has been litigated and finally closed. *Stainless Specialty Manufacturing Co. v. Industrial Commission*, 144 Ariz. 12, 695 P.2d 261 (1985). In the present case, applicant is not attempting to relitigate the issue of whether she has a permanent impairment. The fact that Dr. Bodnar held the opinion that applicant had a permanent impairment when her claim was closed in 1988 is of no consequence. Regardless of whether Dr. Bodnar's assessment of permanent impairment was correct, the fact remains that he feels that applicant's condition has changed to the point where she now needs active medical care and is unable to work. Defendants' argument may have some merit if Dr. Bodnar had felt that applicant's condition was not stationary as of the date of the closure and that she required the treatment he is now recommending. This, however, is not the case. As of the date of the closure of applicant's claim in 1988, Dr. Bodnar agreed that her condition was stationary and that she needed only occasional supportive care. Dr. Bodnar agreed that the trigger point injections that he had been using to alleviate applicant's back problems was no longer effective. Thus, in the present case, there are various grounds supporting reopening. There has been a change in medical recommendation from conservative treatment to surgery. *City of Scottsdale v. Industrial Commission*, 158 Ariz. 574, 764 P.2d 335 (App.1988). Further, there has been an increase in subjective pain which has resulted in an earning capacity disability, which also justifies reopening. *Tarpy v. Industrial Commission*, 138 Ariz. 395, 675 P.2d 282 (App.1983).

The administrative law judge affirmed the award on administrative review, and Pacific then brought this special action.

Although conceding that claimant's and Dr. Bodnar's testimony established both that claimant's symptoms had worsened and that she now required active care, Pacific argues that claimant was precluded from establishing the critical causal connec-

tion between the industrial injury and the worsened symptoms.

Pacific argues that claimant could have litigated the issue of permanent aggravation based upon the aggravation of the underlying degenerative disc disease, but instead elected to settle the dispute and agreed that the closure notice would "become final and *res judicata* as to those issues that could have been litigated at this time." Because Dr. Bodnar conceded that the industrial injury contributed to the worsened symptoms only if it had permanently aggravated the underlying degenerative disc disease, Pacific concludes that the final closure without permanent impairment precludes reopening.

To support this argument, Pacific principally relies on *Perry v. Industrial Commission*, 154 Ariz. 226, 741 P.2d 693 (App. 1987). In *Perry*, a professional basketball player suffered a back injury. This claim was subsequently closed without permanent impairment. He protested this closure, and the dispute went to hearing. The claimant produced medical evidence that the industrial injury had symptomatically aggravated an underlying condition and that treating physicians had diagnosed a stress fracture that causally contributed to the claimant's condition. The carrier, on the other hand, presented medical evidence that the claimant's ongoing symptoms were related solely to the underlying condition. The administrative law judge found that the underlying condition caused the ongoing symptoms and accordingly closed the claim without permanent impairment. Claimant did not seek review and the award became final.

Several years later, the claimant petitioned to reopen because of worsened back pain, and presented evidence that the industrial injury had caused a stress fracture, which contributed to further degeneration and caused the worsened pain. The administrative law judge concluded that the prior award precluded reopening on this basis. On appellate review, this court affirmed the award:

Because the claimant could have litigated the cause of the ... [underlying condi-

tion] when the claim was closed, the determination that it is a developmental abnormality is final.

*Perry*, 154 Ariz. at 231, 741 P.2d at 298 (citing *Govan v. Industrial Comm'n*, 23 Ariz.App. 261, 532 P.2d 533 (1975) (claimant attempted to reopen for worsened psychological condition, but prior determination that the condition was not causally related to the industrial injury precluded relitigation of the causal connection), and *Waller v. Industrial Comm'n*, 6 Ariz.App. 249, 431 P.2d 689 (1967) (claimant attempted to reopen for new conditions related to surgery, but prior determination that the surgery was not causally related to the industrial injury precluded relitigation of the causal connection)).

The difference between *Perry* and this case lies in the scope of the previous litigation. In *Perry*, the causal connection between the industrial injury and claimant's underlying condition, whether it was aggravation or a stress fracture, was litigated. Here, the sole issue determined by the settlement agreement was whether at that time claimant's industrial injury resulted in a permanent impairment. The agreement expressly acknowledges that conflicting medical evidence existed on this issue. The fact that claimant's medical expert's opinion that the condition was permanent was based upon an aggravation of the underlying degenerative disease is irrelevant. The settlement agreement did not purport to adjudicate whether a causal connection existed between the industrial injury and the underlying degenerative disease. If this matter had been tried rather than settled, because claimant's symptoms were nondisabling when the claim was closed, an administrative law judge could have accepted Dr. Bodnar's opinion that the industrial injury had permanently aggravated the degenerative disc disease and nevertheless have concluded that the industrial injury had not resulted in permanent impairment. Thus, the settlement agreement simply adjudicated that, assuming that such a causal connection existed, it did not result in a permanent impairment.

Admittedly, if claimant had sought reopening based solely on Dr. Bodnar's opinion as of the date of the settlement agreement that claimant was permanently impaired because of an aggravation of the underlying condition, principles of issue preclusion and *Perry* would prevail. However, Dr. Bodnar testified that claimant's condition had in fact worsened and that surgery was now recommended. Because we have noted that the previous settlement did not adjudicate the causal relationship between the injury and the underlying condition, the administrative law judge was free to consider whether this evidence resulted in a new, additional, or previously undiscovered condition that would allow reopening.

Moreover, prior litigation is relevant to the distinction between claim and issue preclusion. Claim preclusion prevents litigation of issues that were actually litigated as well as ones that could have been litigated. Issue preclusion prevents litigation only of issues that were actually litigated and determined and only if that determination was essential. *See, e.g., Western Cable v. Industrial Comm'n,* 144 Ariz. 514, 698 P.2d 759 (App.1985); *Red Bluff Mines, Inc. v. Industrial Comm'n,* 144 Ariz. 199, 696 P.2d 1348 (App.1984).

In the current case, Pacific concedes that the claim at reopening differed substantively from the claim at closing. Its preclusion argument concerns a causation issue—whether the *industrial injury permanently aggravated the degenerative disc disease*—that is common to the distinct claims. In our opinion, preclusion applies at reopening only if the elements of issue preclusion are satisfied. These elements, of course, were not satisfied here.

Finally, claimant argues that the settlement agreement is unclear as to the scope of preclusion. We agree. Assuming *arguendo* that a claimant may bargain away a potential right to reopen, we conclude that the terms of the settlement must unambiguously express such a bargain. To satisfy this standard, the agreement must specify the issues that have been finally determined. Generalities are insufficient.

In the present case, preclusion would apply only if claimant had acknowledged that she had underlying degenerative disc disease and agreed that her industrial injury had not permanently aggravated it.

Based on the foregoing, the award is affirmed.

EHRLICH and EUBANK, JJ., concur.